**BOSTON'S CHILDREN FIRST, et al.**

v.

**BOSTON SCHOOL COMMITTEE, et al.**

**No. 99–11330–RGS.**

United States District Court, D. Massachusetts.

Jan. 25, 2002.

---

**12.** The materials underlying these cases were made available to the parties in *United States*   *v. Lacy, supra.*

Chester Darling, Boston, MA, for Plaintiffs.

Frances S. Cohen, Diane diIanni, Hill & Barlow, Merita A. Hopkins, City of Boston Law Department, Boston, MA, for Defendants.

Joel Z. Eigerman, Newton, MA, Joel Z. Eigerman, Murtha Cullina Roche Carens & DeGiacomo, Boston, MA, for Interested Parties.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

The plaintiffs, ten white school-age children who reside in the City of Boston, joined by Boston's Children First, an advocacy group, allege that the Boston School Committee's race-based school assignment plan denied them admission to the public school of their choice in violation of federal and state law. The children seek either compensatory or nominal damages, as well as declaratory and injunctive relief. The defendants deny that in the majority of instances race was the determinative factor in the children's school assignments. Asserting that race is no longer considered in assigning students to the Boston public schools, defendants maintain that there is no "case or controversy" before the court and that summary judgment should therefore enter on plaintiffs' prayer for declaratory relief. Defendants also maintain that none of the individual plaintiffs have standing to seek injunctive relief as they have all either withdrawn from the Boston school system or have been placed in the school of their choice. Finally, defendants challenge the participation of Boston's Children First in this lawsuit.

## BACKGROUND

The named plaintiffs are Michael Gattozzi, Kathleen McCoy, Nicholas Anderson, Kayleigh Barry–Meltzer, Sean Stoddard, John Feeney, Jamie Lee Higgins, Andrew Sharaffa, Thomas Stoddard

and John O'Toole.[1] Boston's Children First is an "advocacy and membership organization" whose goal is to achieve a "reform policy" returning the City of Boston to "neighborhood schools." Boston's Children First contends that the Boston School Committee's "anti-white" student assignment policy remains "the main barrier to the reform of our schools."

### Previous Orders

On May 19, 2000, Judge Gertner, to whom the case was initially assigned, deferred acting on the defendants' motion to dismiss on grounds of standing and mootness. Judge Gertner agreed with plaintiffs that they "should be allowed to conduct discovery before the court addresses any of the arguments premised on the information contained in the affidavits of [Hagop] Yessayan [the Director of Records Management for the Boston Public Schools]." *Boston's Children First*, 98 F.Supp.2d, at 114. She further observed that:

> Yessayan's affidavits do not fully explain the workings of the school assignment process (the role of the three school zones and ideal racial percentages in the assignment process, how temporary and permanent seats are determined, how race affected the students with present school guarantees and how these students affected the number of available seats in the assignment process, the effect of present school guarantees on the future assignment process, etc.). The

Court believes that the further workings of the adversary process will produce a more intelligible record from which to evaluate the plaintiffs' claims.

*Id.* at 115.

Judge Gertner also deferred acting on the defendants' suggestion of mootness. She reasoned that " it is not clear that the [S]chool [C]ommittee vote" taken on July 14, 1999, purporting to eliminate race as a factor in student assignments, is "sufficient to satisfy the 'no reasonable expectation [of recurrence]' standard." *Id.* at 116. Judge Gertner further stated that she did not have adequate information to address plaintiffs' argument, that notwithstanding the School Committee's vote, the "continuation of the allegedly unlawful zones adversely affects [plaintiffs'] school assignments." She ruled that the "plaintiffs should be given the opportunity to conduct discovery to gather the requisite information to clarify this theory." *Id.* "Upon completion of discovery, if there is no factual dispute over whether the plaintiffs' school assignments are unlawfully affected by the continued use of the zones, the claims relying on this argument can be disposed of on summary judgment." *Id.*

Plaintiffs also sought to certify a class for which the ten individually named plaintiffs would serve as class representatives. The proposed class would consist of all children who: (1) live in the city of Boston; (2) are of school age; (3) were classified under the School Committee's prior as-

---

**1.** Judge Gertner previously dismissed the requests for injunctive relief of Nicholas Anderson, Kayleigh Barry–Meltzer, Michael Gattozzi, Kathleen McCoy and Sean Stoddard. She did not, however, rule on these plaintiffs' prayers for declaratory relief and claims for damages. With respect to injunctive relief, she held:

> [i]t is uncontested that some of the plaintiffs did not seek assignments in the 1999–2000 school year and have not indicated any

present intention to seek an assignment in the 2000–2001 school year. Injunctive relief is unnecessary to redress the injuries of these plaintiffs as they have not indicated that they will even participate in the future school assignment plan. In other words, they are currently attending the school of their choice.

*Boston's Children First v. City of Boston*, 98 F.Supp.2d 111, 117 (D.Mass.2000).

signment plan as "white"; and (4) were denied access to a public school because of that classification. In an Order dated June 29, 2000, Judge Gertner declined to address the class certification issue until the standing and mootness issues were resolved.

On March 26, 2001, the case was transferred to this session by the Court of Appeals. The parties were directed to complete discovery regarding the standing and mootness issues, and to submit further briefing once that discovery had been concluded. On August 22, 2001, the court heard oral argument on defendants' motion contesting plaintiffs' standing to maintain this lawsuit. The undisputed or uncontroverted facts relevant to the disposition of that motion are set out below.

*Controlled Choice Student Assignment Plan*

Students are assigned to schools in the City of Boston under a so-called "Controlled Choice Student Assignment Plan." For purposes of elementary and middle school assignments, the City of Boston is divided into three geographic zones: the East Zone, the North Zone, and the West Zone.[2] Each zone has its own administrative structure headed by a Zone Superintendent whose staff includes specialists in bilingual education, special education, curriculum development, in-service training, and student transportation. A Parent Information and Student Assignment Center in each zone helps parents cope with the school assignment process and provides other administrative support. Parent Councils and School Improvement and Planning Councils are intended to encourage parental involvement in school issues.

The boundaries of the zones are for the most part contiguous with major streets and avenues. "[T]he zones are drawn so as not to divide existing well-defined neighborhoods." Second Halloran Aff. ¶ 5. Students may apply to any school in the zone in which they reside. *Id.* ¶ 3. The plaintiffs all reside in the East Zone, which includes thirty Boston elementary schools. Students may also apply to designated citywide elementary programs such as Young Achievers and the Mission Hill School. Defendants' Ex. D(1).

Under the "New Plan," which took effect at the beginning of the 2000 school year, the following factors are considered in assigning students to a particular school: (a) the applicant's ranking of schools by choice; (b) whether a sibling is already assigned to the school; (c) whether the applicant lives within the school's "walk zone";[3] and (d) the relative weight of a student's random number.[4] Prior to the 2000 school year, under the "Old Plan," assignments were also adjusted to conform to "ideal racial percentages." Fourth Yessayan Aff. ¶ 12. If, for example, the "ideal" racial percentage for K–2 students in the West Zone was 20% white, 60% black, and 20% other minorities, and assuming that a school had 100 available seats, 20 seats would be allocated to white students, 60 seats to black students, and 20 seats to other minorities. Kindergarten seats under the Old Plan were also designated as

---

**2.** High school assignments are made on a citywide basis.

**3.** A "walk zone" is the area within a one mile radius of a given elementary school (or within 1½ miles of a middle school). Plaintiffs maintain that under the Old Plan, white children were arbitrarily denied walk preferences, and that some geocodes (tracts enumerated by the Census Bureau) were excluded from certain walk zones for racial reasons.

**4.** Random numbers are assigned by a race-blind computer program. The lower a student's random number, the greater its relative weight in determining the student's ultimate school assignment.

"permanent" or "temporary." Because typically kindergarten programs are half-day, many schools had a "surplus" of kindergarten seats as compared to seats for full-day grade school students. A permanent kindergarten seat guaranteed a student a seat in the school's first grade class. A student assigned to a temporary seat, on the other hand, was required to apply for a first grade seat, assuming that all openings had not been filled by students with permanent seats. Plaintiffs allege that because of the School Committee's racial balancing policy, minority students received a disproportionate share of the permanent seats at certain schools. On July 14, 1999, the Boston School Committee voted to amend the Old Plan to eliminate race as a factor in the school admissions process.

Under the New Plan, students submit applications ranking their choice of schools in a series of assignment rounds. If a student fails to submit a timely application for the first round, he or she is not considered until the second round. If he or she misses that deadline, consideration is deferred to the third round, and so on. It goes without saying that a student is more likely to receive his or her first (or second) choice of schools if he or she applies for first round consideration.

In making assignments, a computer program sorts a student's choices of schools according to the following hierarchy:

*first priority: sibling and walk zone*— student has a sibling already assigned to the school *and* student resides within walk zone of school.

*second priority: sibling*—student has a sibling already assigned to the school.

*third priority: walk zone*—student resides within the walk zone of the school

Preference is given to the student with the higher priority ranking. In the event of a tie, the student with the lower random number is chosen. On November 10, 1999, the School Committee voted, on Superintendent Thomas Payzant's recommendation, to reduce the allocation of walk zone preferences from 100% to 50% of the available seats in each school. Fourth Halloran Aff., at Ex. 1.

### INDIVIDUAL PLAINTIFFS' ASSIGNMENTS

#### Nicholas Anderson

In 1995, Nicholas applied for a K–1 kindergarten assignment after three selection rounds had been completed. He did not receive a kindergarten seat.

In 1996, Nicholas applied to five K–2 kindergarten programs: O'Hearn, Murphy, the Murphy Half–Day Program, Kenny and the East Zone Early Learning Center. Nicholas was admitted to none of his choices. At Nicholas' first choice, the O'Hearn School, all seats were filled by students with permanent seats or by students with sibling preferences. Nicholas' second choice, the Murphy School, admitted six black students with lower priority rankings. Fourteen white students with higher priority rankings, however, were also not admitted. Nicholas' third choice, the Murphy Half–Day Program, was filled by students with permanent seats or by students who had listed Murphy Half–Day as their first choice. All available seats at Nicholas' fourth choice, the Kenny School, were filled by students with permanent seats or by students who had listed Kenny as their first choice. At Nicholas' fifth choice, the East Zone Early Learning Center, all available seats were filled by students who had selected the Center as their first choice. In visiting the East Zone Parent Center, Nicholas' mother, Ellen Dowd, found that there were openings at Nicholas' fourth choice, the Kenny

School. Nicholas was given a temporary K–2 seat at Kenny.[5]

In 1997, Nicholas applied for first grade assignments at the O'Hearn, Murphy, Kenny, Taylor, and P.A. Shaw Schools. Nicholas did not apply until the third selection round. Nicholas' first, second and third choice schools had been filled during the first two rounds. Nicholas was assigned to Taylor, his fourth choice school. Nicholas did not reapply in the 1998, 1999, or 2000 school years, and remains enrolled at the Taylor School.[6] Plaintiffs contend that Nicholas lives within one mile of the O'Hearn and Murphy Schools, and was arbitrarily denied walk zone preferences to these schools.

*Kayleigh Barry–Meltzer*

In 1997, Kayleigh applied for K–2 kindergarten programs at O'Hearn Extended Day, Condon Extended Day, Clap Extended Day, Perkins Extended Day, and Murphy Extended Day. Kayleigh's first choice, O'Hearn, accepted only two students with walk zone preferences. Her second choice, Condon, accepted eight black students with lower priority rankings, however, eight white students with lower random numbers and/or higher priority rankings were also rejected. Sixth Yessayan Affidavit ¶ 3. Kayleigh was given a temporary seat at Clap, her third choice.

Because Kayleigh's seat at Clap was temporary, she was required to reapply in 1998 for a first grade assignment. Kayleigh was not admitted to Clap. While one black student was assigned to Clap who had a lower priority ranking than Kayleigh, six other white students with higher

rankings were also denied admission. Kayleigh's second choice for the 1998 school year, the O'Hearn School, was filled by students with permanent seats. Kayleigh's third choice, the Murphy School, was filled by students who had listed Murphy as their first choice school, or by students with permanent seats. Kayleigh was assigned to the Holland School, which was not one of her choices. Believing that Holland could not provide for Kayleigh's special learning needs, Kayleigh's mother sought to transfer her to the Russell, Everett or Condon Schools. At Russell, the available slots were filled by a student with a lower random number and by a student with a sibling preference. The Everett School had no openings. Condon had three openings. Two were filled by students with lower random numbers. The remaining opening was filled by a black student with a higher random number. However, eight white students with random numbers lower than Kayleigh's were also not admitted. Kayleigh then withdrew from the Boston public school system.

*John Feeney*

In 1999, John applied in the third round for a K–2 kindergarten seat at five East Zone schools. His first and second choices, the O'Hearn and Murphy Schools, had been filled during the first two rounds. At John's third and fourth choices, the Kenny and Perkins Schools, all available seats were awarded to black students with higher priority rankings. John was assigned to his fifth choice, the Taylor School. However, two weeks after the

---

**5.** Ellen Dowd states that she did not know that Nicholas' assignment at Kenny was temporary. By the time she was informed that he was required to reapply, rounds one and two had ended, thus costing Nicholas a permanent seat at Kenny. Second Dowd Affidavit ¶ 10.

**6.** Dowd states that she did not seek a transfer for Nicholas after the first grade "because all of the seats at schools she wanted Nicholas to attend were filled." *Id.*

beginning of the school year, for reasons that are unexplained, John received a transfer to the Murphy School, his second choice. John attended Murphy in 2000–2001, but left the Boston school system at the beginning of the 2001 school year. Plaintiffs assert that John lives within one mile of the O'Hearn School, but was denied a walk zone preference.

### Michael Gattozzi

In 1997, Michael applied to K–1 kindergarten programs at the Channing and Mattahunt Schools. Openings at Channing were filled by students with lower random numbers, or by students with sibling and/or walk zone preferences. Michael was admitted to his second choice, Mattahunt, but chose not to attend. The parties dispute whether Michael should have received a walk zone preference to Channing.

In 1998, Michael applied for, and was assigned to, a K–2 kindergarten program at the Roosevelt School. Michael still attends Roosevelt, and did not apply for reassignment in the 1999, 2000, or 2001 school years.

### Jamie Lee Higgins

In 1998, Jamie Lee applied to the O'Hearn Half–Day and the O'Hearn Extended Day K–1 kindergarten programs. Because her application was late, all available openings were filled. Jamie applied to the O'Hearn K–2 kindergarten program in 1999, but students with enrolled siblings or lower random numbers took all of the available seats. Fourteen walk zone students with random numbers lower than Jamie Lee's were also not admitted. Jamie was assigned to her second choice, the Murphy School. Jamie has not sought a transfer and continues to attend Murphy.

### Kathleen McCoy

In 1995, Kathleen applied to K–1 kindergarten programs at O'Hearn Extended Day and Half–Day, and to the Murphy and Kenny Schools. Kathleen did not receive a placement at O'Hearn Extended–Day because all openings were taken by students with guaranteed seats or sibling preferences. Kathleen did not receive an assignment at O'Hearn Half–Day because all openings went to students who had selected O'Hearn as their first choice. At Kathleen's third choice, Murphy Half–Day, nine black children with higher random numbers received assignments. Plaintiffs argue that Kathleen was denied a walk zone preference to Murphy, which would have boosted her priority ranking to forty-two. Nonetheless, thirty-nine "first choice" and eleven "second choice" white students would have taken precedence. Kathleen was assigned a temporary seat at her fourth choice, Kenny Half–Day. All permanent seats at Kenny were assigned to students who had selected Kenny as their first or second choice. One black student was admitted who had listed Kenny as her fifth choice; however, sixty-four white students with random numbers lower than Kathleen's were denied admission to Kenny.

In 1996, Kathleen applied to K–2 kindergarten programs at the O'Hearn, Murphy, Condon and Kenny Schools. The O'Hearn slots went to students with permanent seats or sibling preferences. Murphy Extended Day accepted six black students with lower priority rankings. However, thirteen white students with priority rankings higher than Kathleen's were also not admitted. Black students with higher priority rankings received assignments to Condon, indisputably costing Kathleen a seat. At Kathleen's fourth choice, the Kenny School, all openings were filled by students who had selected Kenny as their first choice. As a result, Kathleen did not receive a kindergarten placement for the 1996 school year.

Kathleen did not apply to the Boston schools for the 1997 school year. In 1998, she applied to the O'Hearn School, Young Achievers and the Mission Hill School. Kathleen was not admitted to O'Hearn because the one available slot was given to a white student with a sibling preference. At Young Achievers, the three slots were filled by first choice students who also had lower random numbers. No seats were available for new students at Mission Hill. Kathleen was administratively assigned to the Shaw School. Kathleen then withdrew from the Boston school system.

*John O'Toole, Jr.*

In 1999, John applied for K–1 kindergarten programs at the East Zone Early Learning Center, the East Zone Early Education Center, O'Hearn Half Day, O'Hearn Extended Day, Condon Integrated Special Needs, and Young Achievers. John did not receive any of his choices. All seats at the East Zone Early Learning Center were assigned to students with lower random numbers or sibling preferences. At the East Zone Early Education Center, all seats were assigned to students who had selected the Center as their first choice, or who had permanent seats at the school. Assignments to O'Hearn Half-Day and O'Hearn Extended Day were given to first choice students. At John's fifth choice, Condon Special Needs, all available seats went to students who had selected Condon as their first, second, third or fourth choices. John's sixth choice, Young Achievers, awarded all of its slots to students who had selected Young Achievers as their first choice.

In the 2000 school year, John applied to K–2 kindergarten programs at the Mattapan Early Education Center, the East Zone Early Learning Center, and at the O'Hearn, Murphy, Kenny, and Condon Schools. John was assigned to Condon, his sixth choice. All available seats at the

Mattapan Early Education Center were given to students with lower random numbers. The openings at the East Zone Early Education Center and the O'Hearn School went to first choice students or to students who had previously been assigned permanent seats. The seats available at Murphy and Kenny were assigned to students who had listed the schools as their first or second choice. John was denied walk zone preferences to the O'Hearn and Murphy Schools. John left the Boston public schools at the beginning of the 2001–2002 school year.

*Andrew Sharaffa*

In 1998, Andrew applied for K–1 kindergarten programs at Everett Extended Day Special Needs, Holmes Extended Day, and South Greenwood Extended Day. All available seats at Everett Extended Day went to students with walk zone preferences. All seats at Holmes and South Greenwood went to students who had designated the schools as their first choice. As a result, Andrew received no placement.

In the 1999 school year, Andrew applied to K–2 kindergarten programs at Young Achievers, Grew Extended Day and Roosevelt Extended Day. All available seats at Young Achievers went to students with lower random numbers. Andrew was assigned to Grew, his second choice, but withdrew from the Boston school system to attend private school.

*Sean Stoddard*

In the 1994 school year, Sean did not apply for a K–1 kindergarten assignment until round three. By then, all of the seats at his first, second and third choice schools (O'Hearn Extended Day, O'Hearn Half Day, and Murphy Half Day) had been filled. Sean was assigned to his fourth choice, Clap Half Day.

In 1995, Sean applied to K–2 kindergarten programs at O'Hearn Extended Day,

Clap Half Day, Russell Extended Day, Murphy Extended Day and Lee Extended Day. All seats at O'Hearn went to students with permanent seats or sibling preferences. A clerical error (a data keypuncher in the Office of Information Systems mistakenly omitted Sean's acknowledgment that he would accept a temporary seat at Clap if a permanent seat were not available) resulted in Sean's rejection at Clap. All seats at Russell, Sean's third choice, went to students with lower random numbers or with sibling or walk zone preferences, or to students who had selected Russell as their first or second choice. Two black students with random numbers higher than Sean's were admitted to Russell. However, six white students who had selected Russell as their first or second choice, or who had lower random numbers, also did not receive assignments. All seats at Murphy Extended Day went to students who had selected Murphy as their first choice.

In 1996, Sean applied for first grade at the O'Hearn School and at Lee Elementary. All but one of the available seats at O'Hearn went to students with lower random numbers. The remaining seat was given to an hispanic student with a higher random number. However, two white students with random numbers lower than Sean's were also denied admission. Sean was assigned to Lee Elementary, his second choice. Sean did not apply for reassignment until 1999, when he received a transfer to the fourth grade Advanced Work Program at the Lee School. In 2001, Sean was admitted to his sixth grade

first choice, the Advanced Work Program at the Wilson Middle School.

*Thomas Stoddard*

In 1998, Thomas applied to K–1 kindergarten programs at O'Hearn Half Day and the East Zone Early Education Center. Thomas was not admitted to O'Hearn because all but five seats were assigned to students with sibling or walk zone preferences, or to students with lower random numbers. Although Thomas did not receive one of the remaining five seats, eleven other white students with lower random numbers were also not admitted. At Thomas's second choice, the East Zone Early Education Center, all seats were assigned to students who had listed the Center as their first choice.

In 1999, Thomas applied to kindergarten programs at the O'Hearn School, the East Zone Early Learning Center, East Zone Early Education, Lee Half Day Special Needs, and Everett Extended Day Special Needs. All seats were assigned to students with lower random numbers, higher choice selections, or sibling and/or walk zone preferences.[7] In 2000, Thomas received his K–2 kindergarten first choice, Lee Elementary. Thomas chose to remain at Lee during the 2001–2002 school year.

*DISCUSSION*

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op. Society*, 3 F.3d 495,

---

7. Thomas was the seventh ranked white child at his first choice school, O'Hearn. Five black students with lower priority rankings and higher random numbers were admitted to O'Hearn ahead of Thomas. Plaintiffs contend that this occurred because the allotment of seats was based on the School Committee's policy of "ideal racial percentages." The top nine ranked black students received the nine seats allotted to blacks, the top three ranked white children received the three seats allotted to whites, and two "others" received the two seats allocated to "other minorities."

497 (1st. Cir.1993). "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor." *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32 (1st Cir.1994). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

### The Claims for Relief

Plaintiffs seek by way of declaratory relief a judgment that the School Committee's racially-based admissions policy deprived them of the equal protection of the laws guaranteed by the Fourteenth Amendment, and subjected them to unlawful racial discrimination in violation of Title VI of the Federal Civil Rights Act, 42 U.S.C. § 2000d. Plaintiffs make similar claims under Art. 111 of the Massachusetts Declaration of Rights.[8] Plaintiffs O'Toole, Higgins, Stoddard (Sean and Thomas), and Sharaffa assert claims for compensatory damages, while plaintiffs Anderson, Gattozzi, McCoy, Barry–Meltzer and Feeney seek only nominal damages. Plaintiffs also ask that the court enter a permanent injunction: (1) ordering that each plaintiff be admitted to the school of his or her choice; (2) enjoining the defendants from the use of race-based practices in all aspects of school governance and student assignments;[9] (3) ordering the dismantling or redrawing of the "racially drawn [master] zones created by the 'Controlled Choice Student Assignment Plan'"; and (4) granting Boston's Children First access to the school records necessary to monitor the defendants' compliance with these orders. Defendants oppose plaintiffs' various requests for relief on grounds of standing and mootness.

### Standing and Mootness

The line demarcating the conceptually distinct doctrines of standing and mootness can easily become blurred, especially in cases involving historical facts. In *Becker v. Federal Election Commission,* 230 F.3d 381 (1st Cir.2000), the Court of Appeals offered a helpful exposition of the boundaries of the two doctrines.

[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter. *See, e.g., Steger v. Franco, Inc.,* 228 F.3d 889, 893 (8th Cir.2000) ( "[S]tanding is based on the facts as they existed at the time the lawsuit was filed."); *White v. Lee,* 227 F.3d 1214, 1236 (9th Cir.2000) (same); *Advanced Mgmt. Tech., Inc. v. FAA,* 211 F.3d 633, 636 (D.C.Cir.2000) (same); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 69, 108 S.Ct. 376, 98 L.Ed.2d 306

---

**8.** Art. 111 states that "[n]o student shall be assigned to or denied admittance to a public school on the basis of race, color, national origin or creed."

**9.** Plaintiffs' request for injunctive relief in this regard asks for an order:
[e]njoining defendants from the use of race-based practices including but not limited to: lotteries, preferences, set-asides, or other means that deny students an equal footing based on race in . . .
(1) assigning children to schools

(2) allocating seats
(3) designing zones
(4) providing special programs
(5) providing students with transportation
(6) controlling representation on parent or site councils
(7) providing extracurricular activities
(8) allocating educational opportunities and benefits.
Second Amended Complaint, at 40.

(1987) (Scalia, J., concurring) ("Subject matter jurisdiction depends on the state of things at the time of the action brought; if it existed when the suit was brought, subsequent events cannot oust the court of jurisdiction.") (internal quotation marks and citations omitted). "The confusion is understandable, given [the Supreme Court's] repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citations omitted). But questions of standing and questions of mootness are distinct, and it is important to treat them separately. *See id.* at 709–10.

*Id.* at 387 n. 3.

To satisfy Article III standing requirements, a plaintiff must demonstrate that he or she " 'has sustained or is immediately in danger of sustaining some direct injury' ... [that] must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).[10] Moreover, "the injury has to be 'fairly ... trace[able] to the ... [official conduct] of the defendant, and [must] not [be] ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Finally, "it must be 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a

favorable [judicial] decision.'" *Id.* at 561, 112 S.Ct. 2130.

█ To demonstrate that a case is moot, defendants must show that the issues entailed are no longer "live or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). A court cannot hear an action that loses "its character as a present, live controversy of the kind that must exist to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (*per curiam*).

That plaintiffs have a legally protected right to compete for admission to the public school of their choice without having to surmount racial barriers erected by school authorities is beyond dispute. *Wessmann v. Gittens*, 160 F.3d 790, 801 (1st Cir.1998). To be entitled to damages for an interference with that right, however, requires more than proof that a barrier existed, for it remains open to the defendants, as here, to come forward with evidence that a plaintiff would have fared no better even had the impermissible factor of race not been considered. *Texas v. Lesage*, 528 U.S. 18, 21, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (*per curiam*). If the result would have been the same, regardless of the plaintiff's race, he or she cannot be said to have suffered an injury attributable to the defendants' unconstitutional conduct. The plaintiff, in other words, would lack standing.

█ A plaintiff, of course, may lack standing to pursue one type of relief and yet have standing to pursue another. *Friends of the Earth, Inc. v. Laidlaw*

---

**10.** Standing requirements under Title VI are at least as stringent, if not more so, than Article III. *See* 15 *Moore's Federal Practice* 3d § 101.62[1] (2001) ("The test for standing un-

der a statute may be more rigorous but not more lenient than the Article III requirements").

*Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Here, in addition to injunctive relief and money damages intended to compensate past harms, plaintiffs seek prospective equitable relief intended to prevent the recurrence of injury. To demonstrate the prospect of future harm, a plaintiff must show more than that he or she has been injured by an unconstitutional practice. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495–496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). And even where an existing case or controversy is shown, to be entitled to a forward-looking remedy, a plaintiff must also satisfy the basic requisites of equitable relief—"the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law."

*Id.* at 502, 94 S.Ct. 669. It is not enough for a plaintiff to assert that he or she "could be" subjected in the future to the effects of an allegedly unconstitutional policy—the prospect of harm must have an "immediacy and reality." *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). And finally, the relief requested must be personal to the plaintiff. "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [government officials] are unconstitutional." *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660.[11]

██ Defendants argue that the School Committee's vote of July 14, 1999, taken one month after this lawsuit was filed, to eliminate race as a factor in the school assignment process, has effectively mooted plaintiffs' claims for forward-looking relief.[12] A claim for prospective relief

---

**11.** Plaintiffs rely on the following statement in *Northeastern Florida Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993), as trumping any necessity of their showing these traditional prerequisites of equitable standing: "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." This thought is repeated with a citation to *Jacksonville* in *Texas v. Lesage,* 528 U.S. at 21, 120 S.Ct. 467: "Of course, a plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered." While *Lesage* "clarifie[s] the 'injury' supporting basic standing" in cases in which forward-looking relief is at issue, "*Lesage* plainly does not hold that a plaintiff may obtain prospective injunctive relief merely by alleging 'an ongoing or imminent constitutional violation,' ... arising out of a practice that has not injured him to date and is highly

unlikely to injure him in the future. Nor can *Lesage* be read to create an exception to *Lyons* where the discriminatory admissions policy is still in place. If the Supreme Court intended so significant and potentially far-reaching a change in the law of standing, surely it would have said so directly, or at least cited *Lyons* .... The Supreme Court has never (in *Lesage* or elsewhere) held that a plaintiff seeking prospective injunctive relief does not have to show ongoing harm or a likelihood of future harm." *Johnson v. Board of Regents of the University of Georgia,* 263 F.3d 1234, 1266–1267 & n. 29 (11th Cir.2001).

**12.** In response, plaintiffs argue that the court should limit itself to a view of "the facts as they existed at the time the complaint was filed," that is, prior to the School Committee's vote. Opposition Memorandum, at 21. Plaintiffs' argument clearly confuses the doctrines of standing and mootness. While there is no doubt that all plaintiffs had standing to seek injunctive relief on June 21, 1999, when the suit was filed, and that some, if not all, may have had standing to pursue monetary damages, standing initially gained does not, like Jonah's whale, swallow all that swims across

becomes moot when "(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631, 99 S.Ct. 1379 (internal citations omitted). As a rule, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). The rule, however, is applied more flexibly to governmental authorities who are expected to be scrupulous in their regard for constitutional obligations. "Courts are more apt to trust public officials than private defendants to desist from future violations." Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3533.7 (2d ed. 1984 & Supp.2001). *See D.H.L. Associates, Inc. v. O'Gorman*, 199 F.3d 50, 55 (1st Cir.1999) (where Town changed an unconstitutional zoning ordinance in response to litigation, it was unreasonable to conclude, without any evidence to the contrary, that the Town would reinstate the offending ordinance once the litigation was concluded). *See also McClendon v. City of Albuquerque*, 100 F.3d 863, 867–868 (10th Cir.1996) ("In order to find a live controversy we would have to assume that defendants will again close their eyes to the anticipated number of jail residents, fail to plan in advance for them, and violate the settlement agreement. We decline to so speculate."); *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir.1991)

(courts place great confidence in genuine acts of official self-correction); *Kiedos v. Apfel*, 45 F.Supp.2d 80, 88 (D.Mass.1999) (same).

■ On May 19, 2000, Judge Gertner dismissed the prayers of plaintiffs Gattozzi, McCoy, Anderson, Barry–Meltzer and Sean Stoddard [13] for an immediate order compelling admission to the school of their choice. As matters then stood, Gattozzi was attending the Roosevelt School and had not sought to transfer to another public school; McCoy had left the Boston public schools in 1999 to attend St. Mary of the Hills, a private religious school; Anderson had attended the Taylor School since 1997 without seeking to transfer; and Barry–Meltzer had similarly remained at St. Mary's School since 1998. Because none of these plaintiffs had sought reassignment under the New Plan, Judge Gertner dismissed their injunctive claims as moot. Of the remaining plaintiffs, Sharaffa, O'Toole, and Feeney left the Boston school system prior to the 2001 admissions season, while Higgins and Thomas Stoddard chose to remain at their current schools. Consequently, their prayers for an order compelling admission to the school of their choice will be *DISMISSED* as moot.

*Declaratory Relief*

■ It is true, as defendants assert, that claims for declaratory relief are as susceptible to mootness considerations as are claims for injunctive relief. *Smith v. University of Washington Law School*, 233 F.3d 1188, 1195 (9th Cir.2000). The expi-

---

its path. "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), quoting *United States Parole Comm'n v. Geraghty*, 445

U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

13. Sean Stoddard, who did not apply for a transfer in 2000, did apply in 2001 and received his first choice school, the Wilson Middle School Advanced Work Program.

ration of plaintiffs' claims for personal injunctive relief does not, however, foreclose the possibility that plaintiffs, nonetheless, have standing to challenge race-based aspects of the school system's present student assignment policy. As *Lesage* states succinctly, "[a] plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered. The relevant inquiry in such cases is 'the inability to compete on an equal footing.'" 528 U.S. at 21, 120 S.Ct. 467. It is also the case, should plaintiffs' request for class certification be granted, that the court would retain jurisdiction to proceed to the merits of the constitutional claims, whether or not plaintiffs' personal claims remained viable. *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).[14]

■ Plaintiffs seek a declaratory judgment that their constitutional and statutory rights to a race-blind competition for admission to the public school of their choice have been violated by the enduring effects of defendants' historical policy of racial balancing. A declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." 10B *Wright, Miller & Kane*, § 2759 (3d ed.1998). *See also Moore's Federal Practice*, § 57.04[3] (3d ed.2000). A declaratory judgment is, however, an inappropriate mechanism through which to address allegations of past harm. *O'Gorman*, 199 F.3d at 54; *Sprint Spectrum L.P. v. Town*

*of Easton*, 982 F.Supp. 47, 52–53 (D.Mass. 1997).

While the Amended Complaint is not clear on this point, I will assume that plaintiffs seek a declaration that aspects of the new admissions plan perpetuate aspects of the Old Plan's racial gerrymandering. Plaintiffs, in this regard, cite the configuration of the master school zones, the "preferential" siting of bilingual programs and early education centers, and the "grandfathering" of racial preferences awarded under the Old Plan. Plaintiffs also cite statements made by Superintendent Payzant suggesting that the School Committee has, since its vote purporting to eliminate race as a factor in student assignments, adopted a policy of manipulating walk zone preferences to promote racial balancing.

In turning to the issue of standing as it affects plaintiffs' claims for forward-looking declaratory and injunctive relief, I will simultaneously address the issue of whether there is a "live" controversy before the court regarding the present school admissions process. Defendants, as previously noted, regard the July 19, 1999 vote of the School Committee as a watershed event "eliminating [any] need for judicial intervention." Defendants' Memorandum, at 17. Plaintiffs, for their part, deride this assertion as "laughable."

> The defendants are asking the Court to ignore the fact that most of the regular-education children now attending Boston Public Schools were assigned under the original Plan and are currently harmed by the racial discrimination admitted to by the defendants. The decision to guarantee children the school they were assigned to based on their race "grand-

---

**14.** Under the *Geraghty* doctrine, a named plaintiff retains a "personal stake" in obtaining class certification "sufficient to assure that Art. III values are not undermined," even

though the plaintiff's substantive claims have expired. On the other hand, if class certification is denied, "the claim on the merits must be dismissed as moot." *Id.*

fathers" the benefit of race-based assignments to "black" and "other" students and "grandfathers" the effects of the discrimination the plaintiffs have suffered. A student granted an assignment to kindergarten on the basis of his or her race is assured the benefit of that discriminatory action for the remainder of elementary school. Therefore, the "white" students are still excluded for potentially six more years from equal opportunity and consideration for a seat at the school of their choice.

Plaintiffs' Opposition Memorandum, at 41.

■ Under the Equal Protection Clause, any government policy that incorporates racial classifications that are intended to benefit one group at the expense of another is subjected to the strictest of judicial scrutiny. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). A race-based policy can only be justified by a compelling governmental interest served by narrowly tailored remedies. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 309, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). As Judge Selya has observed, the only racially-oriented interest that has achieved decisional consensus as genuinely compelling is one of remedying the legacy of past discrimination. *Wessmann*, 160 F.3d at 795. *See also Hopwood v. State of Texas*, 78 F.3d 932, 944 (5th Cir.1996) ("No case since *Bakke* has accepted diversity as a compelling state interest under a strict scrutiny analysis"). *Cf. Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–494, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) ("[U]nless [racial classifications] are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility").

■ After years of district court oversight, the First Circuit, in 1987, tentatively concluded that the school system's student assignment process had achieved "unitariness," that is, had achieved desegregation. *Morgan v. Nucci*, 831 F.2d 313, 326 (1st Cir.1987) (remanding the issue for a redetermination by the district court). In May of 1990, the district court agreed, and withdrew from further oversight of the school desegregation plan. *Morgan v. Boston School Committee*, No. 72–CV–00911 (D.Mass. May 31, 1990); *see also Morgan v. Gittens*, 915 F.Supp. 457, 464–465 (D.Mass.1996). "Once there is a finding of unitariness and the 'affirmative duty to desegregate has been accomplished,' school authorities are not expected to make 'year-by-year' adjustments of the racial composition of student bodies' absent a 'showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect racial composition of the schools.'" *Wessmann*, 160 F.3d at 801, quoting *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 32, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). *See also Freeman v. Pitts*, 503 U.S. 467, 494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).

■ Plaintiffs argue that they are entitled to declaratory relief on the grounds, among others, that the School Committee has "done nothing to change the racially gerrymandered [master] zones" (the East, West and North Zones). When created in 1989, the zones were drawn to mirror the racial and ethnic composition of Boston's K–1 through 8 student population (then 24% white and 76% minority), consistent with court orders then in place.[15] Plain-

---

**15.** In 1972, the district court had found that the Boston public schools were racially segregated as a matter of deliberate School Committee policy. *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.1974). Among its remedies, the court ordered the city divided into

tiffs' assertion that the zones were drawn in defiance of the First Circuit's 1987 *Morgan* decision, "declar[ing] that the Boston Public Schools are unitary," somewhat overstates the Court of Appeals' provisional holding. *See Morgan*, 831 F.2d at 321 ("Subject to the district court's further assessment on remand, we believe the record tends to show that the school defendants have exhibited a degree of good faith consistent with a finding of unitariness"). Moreover, it is undisputed that considerations other than race influenced the makeup of the zones, among them, the goal of keeping traditional neighborhoods intact.[16] Thus, the North Zone includes the neighborhoods of Allston–Brighton, Mission Hill, Fenway, Back Bay, Chinatown, the North End, the South End, Beacon Hill, Charlestown and East Boston. The West Zone consists of the neighborhoods of Roxbury, Jamaica Plain, Roslindale, West Roxbury and portions of Dorchester. The East Zone, in which all of the plaintiffs reside, is comprised of the neighborhoods of South Boston, Dorchester, Mattapan and Hyde Park.

At the time the zones were drawn, the East Zone had a student population that was 23% white, 61% black and 16% "other" minority.

When compared to the K–8 systemwide racial/ethnic proportions, the East Zone varies –1 percentage point for whites, +13 percentage points for blacks, and –13 percentage points for other minority students. Overall, the East Zone varies only + and –1 percentage point from the systemwide proportions of white and combined minority students at the K–8 level.

Defendants' Exhibit D(1). Currently, the East Zone's K–1 through 8 student population is 13% white, 64% black, 8% Asian and 15% Hispanic. Second Yessayan Aff. ¶ 33. The boundaries of the East Zone have remained unchanged (as have those of the other zones) since 1989. Over the years, fluctuating demographics and the dismaying exodus of white students from the school system have made the goal of zonal racial balancing largely unachievable, while zonal administrative purposes have endured.[17] Because the zones today, whatev-

eight geographic zones reflecting the racial composition of the city's student population. *See Morgan v. Kerrigan*, 401 F.Supp. 216, 256–261 (D.Mass.1975). Consultants Charles Willie and Michael Alves, who recommended the creation of the master zones in 1989, assured the School Committee "that the proposed [zone] plan is consistent with all outstanding court orders in *Morgan v. Nucci* and is in conformity with the U.S. Court of Appeals ruling of September 28, 1987." Defendants' Exhibit D(1).

16. According to John Halloran, Senior Officer of the Department of Implementation, the consultants discussed dividing the East and West Zones along Blue Hill Avenue.

That division would have split the Mattapan neighborhood right through the center. Upon hearing concerns from the residents of the Mattapan neighborhood that their neighborhood was being divided, the School Department rerouted the boundary

line from Blue Hill Avenue on to Harvard Street and to follow approximately one-half mile of railroad tracks, then veering slightly to the west using the George Wright Golf Course and the Stony Brook Reservation as the zone line.

Second Halloran Aff. ¶ 6.

17. Each of the master zones operates as a "small school system.... [offering] an opportunity to achieve decentralization in the educational bureaucracy." Defendants' Exhibit D (Ex. 1—Controlled Choice Assignment Plan), at 15. Within each zone an effort was made to ensure that

enough schools of varying characteristics are available to serve the comprehensive learning needs of students without transporting many of them to distant sectors of the city. These Student Attendance Zones facilitate the development of a rational and single transportation system that can deliver children with multiple learning needs to a variety of schools within a zone.

er role race may have played in their creation, serve administrative, rather than racial balancing purposes, I conclude that no viable "case or controversy" exists regarding their current configuration.[18]

Plaintiffs next contend that the School Committee's current walk zone preference policy is being unconstitutionally manipulated to deny white students an equal opportunity to compete for seats in neighborhood schools.[19] Plaintiffs point to Superintendent Payzant's statements at a February 23, 2000 meeting of the State Board of Education. In describing amendments to the Controlled Choice Student Assignment Plan, Superintendent Payzant explained that the School Committee had reduced walk zone preferences from 100% to 50% for the following reasons.

> There was a concern that if, with the removal of the racial guidelines, we maintain the 100% walk zone preference, that that could be problematic.... [It] is significant in terms of our commitment to continue to make sure that there is an effort to maintain and improve quality, to make sure that access is there to opportunity, to make sure that racial isolation doesn't increase and that racial imbalance improves....
>
> The Department of Implementation, which is a unit within the School Department that has full responsibility and is accountable for monitoring and managing the implementation of the student assignment process ...[will] do checkpoints at various times through the year and give me data. For example, we look at what schools are over and under chosen. We look at what's happening with new students that are coming to Boston from the outside. We look at all of the racial data, achievement data and the like.... If we saw some slippage, for example, in certain schools, we could say, "Well, we are not going to have a 50% walk zone preference in those schools." We could reduce it to 30 or 25 or 20, to offset any adverse impact that might appear.

*Id.* at 14–15. The School Committee, as a prospective matter, is not required to ignore completely the racial distribution of the city's student population in deciding whether or not to maintain the zones as presently constituted. *Cf. Hunt v. Cromartie*, 532 U.S. 234, 121 S.Ct. 1452, 1458, 149 L.Ed.2d 430 (2001) ("Race must not simply have been '*a* motivation for the drawing of a majority minority district' but 'the *predominant* factor motivating the legislature's districting decision' ").

**18.** No plaintiff has expressed a desire to attend a school outside of the East Zone, or complains of having been frustrated in an attempt to do so.

**19.** On November 10, 1999, the School Committee voted the following modifications to the Controlled Choice Student Assignment Plan:

> ORDERED, that the Boston School Committee hereby modifies the Controlled Choice Student Assignment Plan as recommended by the Superintendent of Schools.

> The following modifications will apply to assignments made for the 2000–2001 school year:
> - Reduce the walk zone preference from 100% to 50% of seat allocations within each school.
> - After walk zone seats are assigned, establish priority to the first- and second-choice school within the assignment zone for students without a geographic walk zone.
>
> The Superintendent and his staff also shall:
> - continue the analyses necessary to determine the feasibility of establishing geographic walk zones that cross assignment zones (North, East, West).
> - continue the analyses of insufficient capacity within walk zones for future consideration of policy modifications.
> - consider changes in walk zones when new schools are built and/or existing schools are expanded.
>
> The results of these analyses should be considered for SY2002–2003 and beyond.

Plaintiffs' Statement of Facts, Ex. 7, at 33–34.[20]

■ Superintendent Payzant's statements are troubling. The implication is that by arbitrarily reducing the number of walk zone preferences accorded to some schools, seats can be opened to black and other minority students who live outside of a given walk zone, presumably at the expense of resident white students. If this interpretation is correct (defendants offer little by way of rebuttal), a "case or controversy" exists as to whether the School Committee's 50% reduction in walk zone preferences was undertaken for the impermissible purpose of racial balancing, and as to whether school authorities intend in the future to manipulate the allocation of walk zone preferences to achieve racial parities in selected schools. *See Wessmann,* 160 F.3d at 799 ("[T]he Policy [a race and ethnicity-based admissions policy to Boston Latin School] is, at bottom, a mechanism for racial balancing—and placing our imprimatur on racial balancing risks setting a precedent that is both dangerous to our democratic ideals and almost always constitutionally forbidden"). It is undisputed that plaintiff John O'Toole was denied a walk zone preference to the Murphy School after the 50% reduction took effect. *Id.* at 37. Plaintiff O'Toole, at least, has standing to challenge the present walk zone preference policy.[21]

Plaintiffs next argue, that despite the School Committee's discontinuance of race as an overt factor in school assignments, the legacy of the Old Plan endures, because under the Old Plan, "guaranteed" kindergarten seats were disproportionately allocated to minority students.[22] Thus, according to plaintiffs, not only are students who received racially preferential treatment under the Old Plan "grandfathered" into their present schools, but their younger siblings, because of sibling preferences, will continue to reap an unfair, race-based advantage in the admissions process. The relief plaintiffs request is that the court order *every* student to reapply under the New Plan. While statistically the chances of some white students being assigned to their first choice school under the New Plan might be enhanced if every child were forced to reapply, plaintiffs have made no showing that they might be among these probabilistic few, or that any one of them, whether presently enrolled in the Boston schools or not, intends to reapply. The "benefit" that plaintiffs seek is simply too conjectural to satisfy the Article III requirement that "it must be 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable

20. The apparent intent of Superintendent Payzant was to assure the Board that Boston intended to remain in compliance with the state Racial Imbalance Act, G.L. c. 71, § 37D. As plaintiffs point out, compliance with the remedial provisions of the Act, assuming its constitutionality, is voluntary.

21. Defendants, borrowing an argument from Judge Gertner's decision in *Comfort v. Lynn School Committee,* 100 F.Supp.2d 57 (D.Mass. 2000), maintain that apart from the exam schools, the Boston public schools are one and the same for student assignment purposes. Judge Gertner, however, explicitly found that "[a]s compared to the Boston Lat-

in School and other Boston public schools, the schools in the Lynn system are more fungible. Nothing indicates that one school is considered clearly superior to all others." *Id.* at 67. The geographic size of the Boston school system, with its historically distinct neighborhoods, makes the Lynn analogy inapt, as Judge Gertner recognized.

22. While plaintiffs offer no evidence that race was in fact considered in the allocation of permanent kindergarten seats, I will, for present purposes, assume that this was the case, defendants having offered no evidence to the contrary.

[judicial] decision.'" *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

Moreover, discrimination cases are no exception to the rule that an equitable remedy should be carefully tailored to fit the nature and extent of the violation being addressed. *See Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann*, 402 U.S. at 16, 91 S.Ct. 1267. Nor are they an exception to the equitable precept that courts should avoid injunctive orders whose cure is worse than the disease. *See Accion de Puerto Rico, Inc. v. Viera Perez*, 831 F.2d 365, 372 (1st Cir.1987) ("The scope of injunctive relief is dictated by the extent of the violation established ... [and] the relief afforded [may not be] more burdensome than necessary to redress the complaining parties"). *Cf. Langlois v. Abington Housing Auth.*, 207 F.3d 43, 49 (1st Cir.2000). The havoc that an order granting the relief plaintiffs seek would wreak on the settled expectations of thousands of parents and students is self-evident. A significant number of students, white, black, and other minority, would be separated from their current school and accustomed schedules, teachers, and schoolmates, including possibly their own siblings.[23] For two suc-

cessive years, school assignments have been made under the New Plan. While vestiges of the Old Plan may, and probably do, still impact the admission process, as plaintiffs maintain, any lingering effects will vanish as the last of the children who received or who will inherit race-based preferences graduate to middle school. Thus, even if a showing could be made that one or more of the plaintiffs might derive an advantage from a system-wide reprocessing of all student assignments, any benefit conferred would be outweighed by the consequent demoralization of a school system that has yet to fully absorb the effects a quarter-century effort to bring itself into compliance with court-ordered desegregation.

I have previously held that the siting of bilingual and early education centers is irrelevant to the plaintiffs' challenge to the Controlled Choice Plan. *See* Order, July 3, 2001. Moreover, plaintiffs have provided no evidence that the centers were in fact sited in particular neighborhoods to promote racial balancing (rather than for reasons of physical space and demographics).[24] Nor, is it possible to conceive how "the preferential placement of bilingual programs"[25] and early education centers

---

**23.** Plaintiffs' suggested remedy would, as a practical matter, require the elimination of sibling preferences at least in the first round of competition.

**24.** During a speech on May 31, 1988, to parents on the "new" student assignment plan, John Halloran stated that the Vietnamese bilingual program was sited at the Jackson–Mann School in Allston (venue for the meeting)

> because ten years ago when we started the program, this is where most of the families first came to; this was the first stop in Boston. Many of the agencies that represented the families coming over, this is where they were able to find reasonable housing for them, and the sponsors, many of them, lived out here.

It is no longer true that many of them live here. They [Vietnamese, Chinese, Laotian and Mung] now live, for the most part, in Dorchester. A few come from Columbia Road up by Savin Hill up to Fields Corner. We still have that program in this school, but many of those children -I think it's 70% of them—are being transported all the way over here for a program that, frankly, should be a lot closer to their homes. But that is an aside.

Plaintiffs' Facts, Ex. 12, at 13–14.

**25.** This is virtually the extent of plaintiffs' briefing on the subject. *See also* Second Amended Complaint, at 13 n. 2 ("[C]omplications and reduced access for 'white' students produced by the Plan's placement of bilingual programs are not developed here").

could have served such a purpose.[26]

*Damages*

██ Five of the named plaintiffs seek compensatory damages: O'Toole, Higgins, Sean and Thomas Stoddard, and Sharaffa. *Id.* ¶ G. The remaining five plaintiffs: Anderson, Gattozzi, McCoy, Barry–Meltzer, and Feeney, seek only nominal damages. *Id.* ¶ H. *Lesage*, as previously noted, makes clear that a plaintiff cannot recover compensatory damages if the same admissions decision would have been made regardless of a race-based policy. *Lesage*, 528 U.S. at 21, 120 S.Ct. 467. Whether *Lesage* precludes a claim of nominal damages as well is less clear. Post-*Lesage* courts considering the issue are not of the same mind. In *Comfort*, Judge Gertner, noting that the plaintiff in *Lesage* did not seek nominal damages, took "the narrower view that the *Lesage* 'injury in fact' holding does not govern standing to seek nominal damages in racial discrimination challenges." *Comfort*, 150 F.Supp.2d at 301. Similarly, in *Thigpen v. Bibb County, Ga., Sheriff's Department*, 223 F.3d 1231, 1242 n. 17 (11th Cir.2000), the Eleventh Circuit, while not deciding the issue, noted that the Supreme Court in *Lesage* did not expressly address nominal damages. Other courts that have considered the issue, for example, *Tracy v. Board of Regents of the University System of Ga.*, 2000 WL 1123268 *9–10 (S.D.Ga. June 16, 2000), *aff'd in part, reversed in part sub nom., Wooden v. Board of Regents of University System of Ga.*, 247 F.3d 1262 (11th Cir. 2001), and *Petit v. City of Chicago*, 2001 WL 629306 *6 (N.D.Ill.2001), have held that *Lesage* implicitly precludes an award of nominal damages. *Lesage* holds that a successful "same decision" defense "avoids

liability" and precludes "cognizable injury." *Lesage*, 528 U.S. at 21, 120 S.Ct. 467. As nominal damages are intended to signify that a claimant's constitutional rights have been affirmatively violated even though the injury cannot be quantified in any monetary sense, I am persuaded that a successful *Lesage* defense bars the award of nominal as well as compensatory damages.

To overcome a *Lesage* defense, a plaintiff seeking compensatory or nominal damages in the circumstances of this case, is required to show that: (1) he or she was denied a walk zone preference because of being classified as "white" and, as a result, was denied admission to a school of his or her choice; (2) he or she was denied a permanent kindergarten seat because of being classified as "white" and, as a result, was denied a first grade seat at the school of his or her choice; (3) he or she was denied admission to the school of his or her choice because of a ceiling placed on the number of otherwise eligible "white" students who would be accepted at the school; and/or (4) he or she was denied admission to the school of his or her choice because an otherwise open seat for which he or she would have been eligible was filled by a student with a racially grandfathered sibling preference.

It is evident from the pleadings that the court's prior orders limiting the instant decision to a consideration of the issues of standing and mootness may have misled plaintiffs as to the extent of their obligation to marshal evidence countering the defendants' *Lesage* defense. In fairness to the plaintiffs, the court will permit a further round of briefing on the subject, and will allow such additional discovery as

---

**26.** While I agree with plaintiffs that the only issue presently before the court is that of standing (mootness), to carry their burden of establishing standing plaintiffs must at least

demonstrate the existence of a viable case or controversy warranting consideration of their requested equitable relief.

plaintiffs are able to demonstrate is necessary for the full development of their case.

*Boston's Children First*

 As with a natural plaintiff, a court must inquire whether an organizational plaintiff has a "personal" stake in the outcome of the controversy. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). "A mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury." *Id.* While Boston's Children First argues that it has "expended considerable resources in providing counseling and information to its members and general public about the challenged assignment policy," this "sunk costs" argument is insufficient, by itself, to confer standing. *See Friends of the Earth,* 528 U.S. at 192 n. 5, 120 S.Ct. 693; *Guckenberger v. Boston University,* 957 F.Supp. 306, 320 (D.Mass.1997).

> [A]n organization has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the law suit.

*Hunt v. Washington State Apple Advertising Com's,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Boston's Children First clearly fails to meet the third prong of the test.

## ORDER

The named plaintiffs' prayers for an order directing admission to the school of their choice is *DENIED* for want of standing. Defendants' motion to dismiss Boston's Children First for want of standing is *ALLOWED.* Defendants' motion for summary judgment on plaintiffs' prayer for declaratory judgment is *ALLOWED* in part and *DENIED* in part as explained in this opinion. The parties shall within fourteen (14) days submit a proposed joint scheduling order governing any additional discovery necessary for further briefing of the *Lesage* issues identified in this opinion, as well as issues of a constitutional dimension raised by the School Committee's walk zone preference policy.

SO ORDERED.