**BOSTON'S CHILDREN FIRST, et al.,**

v.

**BOSTON SCHOOL COMMITTEE, et al.**

No. CIV.A. 99–11330–RGS.

United States District Court, D. Massachusetts.

April 23, 2003.

See also 183 F.Supp.2d 382.

Chester Darling, Robert Roughsedge, Boston, MA, Michael Williams, for plaintiffs.

Frances S. Cohen, Dechert LLP, Diane diIanni, Hill & Barlow, PC, Merita A. Hopkins, Boston Police Department, Boston, MA, Erica Hovani, for defendants.

*FINDINGS OF FACT, RULINGS OF LAW, AND ORDER OF JUDGMENT AFTER A NONJURY TRIAL*

STEARNS, District Judge.

## INTRODUCTION

This case may possibly be the concluding chapter in thirty years of litigation over the effort to desegregate the Boston public schools. It began in 1999, when the parents of ten white school children challenged the preferences given to black and other minority students under a "controlled choice" school assignment plan implemented by the defendant Boston School Committee in the 1980's. Plaintiffs won a victory, when, in response to their lawsuit, the School Committee voted to eliminate racial preferments in school admissions for the 2000–2001 school year. Despite the School Committee's vote, the litigation continued, plaintiffs claiming that vestiges of the discriminatory policy persisted in the new admissions plan. Plaintiffs focused on the School Committee's decision to reduce the number of seats allocated to students living within walking distance of neighborhood schools, a decision that plaintiffs contend discriminates against white students. Plaintiffs maintain that the School Committee's justifications for the decision, preserving parental choice and promoting diversity, are nothing more than euphemistic camouflage for an unconstitutional policy of racial balancing.

## BACKGROUND

The Controlled Choice Student Assignment Plan (Old Choice Plan) was a near if

distant relation of the original Boston school desegregation order entered by Judge W. Arthur Garrity in 1972. *See Morgan v. Hennigan*, 379 F.Supp. 410, 484 (D.Mass.1974), *aff'd*, 509 F.2d 580 (1st Cir. 1974). Underlying Judge Garrity's order was a finding that Boston school officials, acting under the direction of the City's elected School Committee, had deliberately gerrymandered school assignments to maintain a dual public school system. In a series of remedial orders, Judge Garrity divided the City of Boston into eight school districts,[1] each with a student enrollment that reflected the percentage of black, white, and "other" minority students found in the then existing school-age population.[2] *Morgan v. Kerrigan*, 401 F.Supp. 216, 252–255 (D.Mass.1975). Judge Garrity's order also set aside a minimum of 35 percent of the seats in matriculating classes at Boston's premier examination schools—Boston Latin School, Boston Latin Academy, and Boston Technical High School—for black and other minority students. *Id.* at 258.

After seven years of intensive supervision, the district court in 1982 began a "transitional course of disengagement" from the school system, while at the same time ordering that racial balances in the eight school districts be maintained indefinitely. The court delegated primary responsibility for monitoring compliance with its orders to the State Board of Education, which was required to submit semiannual reports on the progress of school integration to the court.

1. A citywide magnet school district was also eventually established, as was an experimental community school district in the western marches of Boston.

2. Judge Garrity also entered remedial orders governing faculty and staff hiring, facilities construction and maintenance, special, bilin-

gual and vocational education, school security, student discipline, and school transportation (more colloquially referred to as busing). *See Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass.1975); *Morgan v. Nucci*, 620 F.Supp. 214, 218 (D.Mass.1985), *aff'd in part, Morgan v. Nucci*, 831 F.2d 313 (1st Cir.1987).

In 1987, the Court of Appeals ruled that the School Committee had achieved "maximum practicable desegregation," and had, as a matter of law, "attained unitary status in school assignments." *See Morgan v. Nucci*, 831 F.2d at 326. Consequently, the Court found that there was no need for a continued "injunction requiring adherence to a particular formula for student assignments." *Id.* It did, however, warn the School Committee against taking any action that might "necessitate a return trip to federal court by school plaintiffs."[3] *Id.* at 326 n. 19.

Freed from court oversight in the matter of school assignments, the School Committee in December of 1988 adopted the Old Choice Plan, which took effect in the September 1989 school year. Its authors, Michael Alves and Charles Willie, termed the plan as "racially fair and provid[ing] students with numerous school choices." They criticized the pre–1988 assignment plan, which had developed topsy-turvy from the court's serial orders in the *Morgan* case, as "too complex and lack[ing in] predictability." More fundamentally, because of demographic changes, the eight court-created school districts had lost their equivalence "in terms of racial and ethnic diversity, neighborhood cohesion and range of school facilities and programmatic options." The substitute plan devised by Alves and Willie organized Boston's (then) seventy-five elementary and twenty-one middle schools into three Master Zones: the East Zone, the North Zone, and the West Zone.[4] The Zones were drawn along major arteries with the view of keeping traditional neighborhoods intact. Each Zone was administered by a superinten-

dent whose staff included specialists in bilingual education, special education, curriculum development, in-service training, and student transportation. The plan called for a Parent Information and Student Assignment Center to be established in each Zone to guide parents through the school assignment process. Parent Councils and School Improvement and Planning Councils were also created to encourage parental involvement in school affairs.

Under the Old Choice Plan, students (or more realistically, their parents) could apply to any school in the Zone in which they resided, or to citywide magnet programs, such as Young Achievers or the Mission Hill School. Assignments were (and are) made in kindergarten, first, sixth and ninth grades by weighing the following factors: (1) how the applicant ranked the school in order of choice; (2) whether a sibling was already attending the school; (3) whether the applicant lived within the school's walk zone (that is, within a one mile radius of an elementary school or a 1.5 mile radius of a middle school);[5] (4) whether the applicant had been previously enrolled in the school on a "temporary" basis; and, all else being equal, (5) by the tie-breaking strength of the applicant's computer-assigned random number.

The trump card, however, was race. No matter how an applicant scored, if a school's prospective student population would by his or her admission cause a deviation of 15 percent or more from the "ideal racial percentages" calculated for the student's Zone, the seat was given to a more "deserving" applicant who fit the desired racial criterion. ("Ideal racial per-

---

3. The Court's ruling did not affect the district court's continued oversight of matters such as the hiring of faculty and staff.

4. High school assignments were (and are) made on a citywide basis.

5. The walk zone is not measured from the student's front door, but rather from the boundaries of the geocode in which the student resides.

centages," as defined by the authors of the Old Choice Plan, mirrored the racial and ethnic composition of the then existing student population in each Zone). The Old Choice Plan also perpetuated the district court's order reserving 35 percent of the seats in the examination schools for black and other minority candidates.

From its inauguration in the 1989 school year, until the filing of this lawsuit in 1999, the Old Choice Plan remained largely intact, despite dramatic shifts in the demographics of the Boston school population. The percentage of enrolled white students dropped nearly in half from 24 percent to 14 percent,[6] while the minority student population, which had been predominately black, absorbed a significant number of Hispanic and Asian students, as well as the children of new immigrants from South America, Central America, the Caribbean, the Cape Verde Islands, and Eastern Europe.

Change began in 1995, when Julia McLaughlin, a disappointed applicant to Boston Latin School, successfully challenged the constitutionality of the minority set-aside policy in the examination schools. *See McLaughlin v. Boston School Committee,* 938 F.Supp. 1001 (D.Mass.1996). Although the School Committee thereafter rescinded the regime of rigid quotas, it substituted a complex admissions formula, which while admitting half of the examination school candidates purely on merit, chose the remainder according to the proportional presence of five defined racial and ethnic groups in a "qualified applicants pool." In August of 1997, Sarah Wess-

mann, who had been denied admission to the Boston Latin School under the new formula, challenged the formula in federal court.[7] In November of 1998, the Court of Appeals agreed with Sarah that any use of race as an admissions determinant offended the constitutional guarantee of equal protection. More specifically, the Court rejected the School Committee's argument that the new policy did not, in fact, result in group favoritism, as the exact racial and ethnic composition of the qualified applicants pool fluctuated from year to year, and therefore resulted in no set preference for any one group.

> This assertion leads nowhere, for the manner in which the Policy functions is fundamentally at odds with the equal protection guarantee that citizens will be treated "as individuals, not as simply components of a racial, religious, sexual or national class." *Miller v. Johnson,* 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (citations and internal quotation marks omitted). Even though we may not know before the fact which individuals from which racial/ethnic groups will be affected, we do know that someone from some group will be benefitted and a different someone from a different group will be burdened.

*Wessmann v. Gittens,* 160 F.3d 790, 794 (1st Cir.1998).

On June 21, 1999, encouraged by the decision in the *Wessmann* case, plaintiffs brought this action challenging the School Committee's practice of structuring school admissions according to "ideal racial percentages." Plaintiffs, in addition to seek-

---

**6.** Immediately prior to the original 1972 desegregation order, white students constituted 61 percent of the enrolled Boston public school student population. *Morgan v. Kerrigan,* 509 F.2d at 583.

**7.** Sarah ranked 91st out of 705 applicants for 90 available seats in the 1997 ninth grade

entering class. Because two applicants with higher scores had declined admission, Sarah would have been admitted to Boston Latin School had composite scores, uninfluenced by race, determined the selection of the two substitute enrollees.

ing damages and equitable relief, sought a declaration that the racial preferences awarded under the Old Choice Plan violated the federal constitutional guarantee of equal protection as well as the rights of white school children under art. 111 of the Massachusetts Declaration of Rights.[8] Plaintiffs sought a permanent injunction ordering, among other relief: that the defendants be permanently enjoined from using racial classifications in all aspects of school admissions; that the "racially drawn" Master Zones be dismantled; and that the School Committee be compelled to reassign all public school students under a racially neutral admissions plan. Plaintiffs also sought certification of a class consisting of all Boston school-age children who had been denied access to the school of their choice because they were white.

On October 29, 1999, the School Committee moved to dismiss the plaintiffs' claims, arguing that the lawsuit had been mooted by a vote taken by the School Committee on July 14, 1999, repealing the use of racial classifications. On May 19, 2000, Judge Gertner deferred decision on the plaintiffs' motion for class certification pending resolution of the mootness issue and a related challenge to plaintiffs' standing. She also permitted plaintiffs to take preliminary discovery on these issues.

On March 26, 2001, the case was transferred to this session. After further discovery was taken by both sides, defendants moved for summary judgment on, *among other grounds, standing and mootness.* After hearing oral argument, on January 25, 2002, the court issued an opinion and order disposing of many of the contested issues. *See Boston's Children First v. Boston School Committee,* 183 F.Supp.2d 382 (D.Mass.2002). With respect to plaintiffs' damages claims, the court ruled that to establish standing, plaintiffs were required to overcome the defendants' evidence that even after the impermissible consideration of race was excluded, they would have fared no better under the Old Choice Plan in obtaining admission to their school of choice. *Texas v. Lesage,* 528 U.S. 18, 21, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (per curiam). On this issue, which had only been recently raised by defendants, the court held that the plaintiffs were entitled to take further discovery.

Turning to the plaintiffs' prayer for individual relief, the court held that the plaintiffs had failed to show a concrete prospect of future constitutional harm.

To demonstrate the prospect of future harm, a plaintiff must show more than that he or she has been injured by an unconstitutional practice. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495–496, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). And even where an existing case or controversy is shown, to be entitled to a forward-looking remedy, a plaintiff must also satisfy the basic requisites of equitable relief—"the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." *Id.* at 502, 94 S.Ct. 669. It is not enough for a plaintiff to assert that he or she "could be" subjected in the future to the effects of an allegedly unconstitutional policy—the prospect of harm must have an "immediacy and reality." *Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). And finally, the

**8.** Art. 111 states that "[n]o student shall be assigned to or denied admittance to a public school on the basis of race, color, national origin or creed."

relief requested must be personal to the plaintiff. "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [government officials] are unconstitutional." [*City of Los Angeles v.*] *Lyons*, 461 U.S. at 111, 103 S.Ct. 1660[, 75 L.Ed.2d 675 (1983)].

*Boston's Children First*, 183 F.Supp.2d at 394. Because none of the plaintiffs had sought reassignment under the New Choice Plan, the court held that their request for an order compelling their admission to the school of their choice was moot.[9]

With respect to the issue of the Master Zones, the court held that demographic changes had eliminated the role that the Zones had been intended to play in the racial balancing strategy devised by Willie and Alves, and that their surviving purpose was to provide administrative support to the central school authority. Consequently, the court ruled that no case or controversy existed regarding the racial makeup of the Master Zones. *Id.* at 399. Addressing the more difficult issue of "grandfathering," the court, while not dismissive of the plaintiffs' argument that discriminatory aspects of the Old Choice Plan would endure until the sibling cohort that had benefitted from the old plan graduated to the middle schools, nonetheless rejected the prayer that every public school student be required to reapply under the New Choice Plan.

While statistically the chances of some white students being assigned to their first choice school under the New Plan might be enhanced if every child were forced to reapply, plaintiffs have made no showing that they might be among these probabilistic few, or that any one of them, whether presently enrolled in the Boston schools or not, intends to reapply. The "benefit" that plaintiffs seek is simply too conjectural to satisfy the Article III requirement that "it must be 'likely,' as opposed to merely 'speculative' that the injury will be 'redressed by a favorable [judicial] decision.'" *Lujan[ v. Defenders of Wildlife]*, 504 U.S. at 561, 112 S.Ct. 2130[, 119 L.Ed.2d 351 (1992)].

Moreover, discrimination cases are no exception to the rule that an equitable remedy should be carefully tailored to fit the nature and extent of the violation being addressed. *See Milliken v. Bradley*, 418 U.S. 717, 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *Swann[ v. Charlotte–Mecklenburg Bd. of Educ.]*, 402 U.S. [1]at 16, 91 S.Ct. 1267[, 28 L.Ed.2d 554 (1971)]. Nor are they an exception to the equitable precept that courts should avoid injunctive orders whose cure is worse than the disease. *See Accion [Social] de Puerto Rico, Inc. v. Viera Perez*, 831 F.2d 365, 372 (1st Cir. 1987) ("The scope of injunctive relief is dictated by the extent of the violation established ... [and] the relief afforded [may not be] more burdensome than necessary to redress the complaining parties"). *Cf. Langlois v. Abington Housing Auth.*, 207 F.3d 43, 49 (1st Cir.2000). The havoc that an order granting the relief plaintiffs seek would wreak on the settled expectations of thousands of parents and students is self-evident. A significant number of students, white, black, and other minority, would be separated from their current school and accustomed schedules,

**9.** The court dismissed Boston's Children First as a plaintiff for lack of standing, holding that the advocacy group was unable to show an actual injury, and thus lacked the requisite personal stake in the outcome of the controversy. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

teachers, and schoolmates, including possibly their own siblings. For two successive years, school assignments have been made under the New Plan. While vestiges of the Old Plan may, and probably do, still impact the admission process, as plaintiffs maintain, any lingering effects will vanish as the last of the children who received or who will inherit race-based preferences graduate to middle school. Thus, even if a showing could be made that one or more of the plaintiffs might derive an advantage from a system-wide reprocessing of all student assignments, any benefit conferred would be outweighed by the consequent demoralization of a school system that has yet to fully absorb the effects a quarter-century effort to bring itself into compliance with court-ordered desegregation.

*Id.* at 400–401 (footnote omitted). Finally, the court ruled that plaintiffs' request for a declaratory judgment invalidating the reduction in the walk zone preference was not amenable to summary disposition.

It is true, as defendants assert, that claims for declaratory relief are as susceptible to mootness considerations as are claims for injunctive relief. *Smith v. University of Washington Law School,* 233 F.3d 1188, 1195 (9th Cir.2000). The expiration of plaintiffs' claims for personal injunctive relief does not, however, foreclose the possibility that plaintiffs, nonetheless, have standing to challenge race-based aspects of the school system's present student assignment policy. As *Lesage* states succinctly, "[a] plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively estab-

lish that he would receive the benefit in question if race were not considered. The relevant inquiry in such cases is 'the inability to compete on an equal footing.'" 528 U.S. at 21, 120 S.Ct. 467[, 145 L.Ed.2d 347]. It is also the case, should plaintiffs' request for class certification be granted, that the court would retain jurisdiction to proceed to the merits of the constitutional claims, whether or not plaintiffs' personal claims remained viable. *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 404, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). *Id.* at 395–396.

The court held a hearing on November 6, 2002, on the parties' cross-motions regarding the constitutionality of the School Committee's decision to reduce the walk zone preference in half under the New Choice Plan. On December 18, 2002, the court ruled that there was a material dispute of fact as to whether the decision had been motivated by a discriminatory animus. A nonjury trial on that issue began on February 10, 2003. The court heard testimony from four witnesses, Ann Walsh, the founder of Boston's Children First, Dr. Lurline Munoz–Bennett, Desegregation Director of the Massachusetts Department of Education, Thomas Payzant, Superintendent of the Boston public school system, and Hagop Yessayan, the Director of the school system's Record Management Unit. Final argument was heard on February 27, 2003.

### FINDINGS OF FACT

On July 14, 1999, in response to plaintiffs' lawsuit, the School Committee, acting on the recommendation of Superintendent Payzant,[10] voted to eliminate the use of

---

**10.** Payzant was hired as Boston's School Superintendent in October of 1995. In making his recommendation to the School Committee, the Superintendent was frank in his as-

sessment, that in the wake of *Wessmann* and other similar federal court decisions, there was a near certainty that plaintiffs would pre-

racial and ethnic considerations in school assignments beginning with the 2000–2001 school year. In explaining his recommendation, the Superintendent rejected a return to the predesegregation system of mandatory neighborhood attendance zones.

> In considering the removal of race as a factor in our student assignment policy, it is important to note that this is not an issue of returning to neighborhood schools. That can happen in an equitable way only when new quality schools are built in neighborhoods that now have an insufficient number of schools to serve resident school age children as is planned. Moreover, it is important to emphasize that a modification in our policy to eliminate race would in no way alter our strong commitment and ongoing efforts to provide parent choice and equal access to resources, to foster diversity, and to improve the quality of education in all our schools.

Ex. 3, July 14, 1999 Memorandum.

As a corollary to its vote abolishing racial quotas, the School Committee ordered the Superintendent and his staff to develop a new student assignment plan reflecting the shift in policy as well as "other changes necessary to maximize access to choice, to support diversity, and promote quality education for the children of the City of Boston." In his subsequent report to the School Committee, the Superintendent cautioned against perpetuating the Old Choice Plan's 100 percent walk zone preference.

> [A] [o]ne hundred percent walk zone preference in a controlled choice plan without racial guidelines could result in all available seats being assigned to students within the walk zone. The result would limit choice and access for all students, including those who have no walk zone school or live in walk zones where there are insufficient seats to serve the students residing in the walk zone.

Ex. 50, November 3, 1999 Memorandum.

The Superintendent's warning was credible. Any assignment plan in the Boston school system is, and will be for the foreseeable future, constrained by the mismatch between school capacity and neighborhood demand, due in part to demographic shifts, and in part to the dual system's legacy of over-serving what were historically white neighborhoods. As Superintendent Payzant testified, the largest shortfall of school seats is concentrated in predominantly minority neighborhoods, such as Roxbury, Dorchester, and Mattapan, while excess capacity exists in white neighborhoods such as West Roxbury. *See* Ex. 44.[11] As a result, a number of minority students had few, and in some cases, no schools within their walk zone when the New Choice Plan was implemented. At the same time, students in traditionally favored neighborhoods had a surfeit of as many as ten schools from which to choose.

On November 10, 1999, the School Committee adopted the New Choice Plan, which eliminated racial quotas and reduced

---

vail in their constitutional challenge to the Old Choice Plan's use of racial quotas.

**11.** This exhibit, which is based on 1997 data, shows substantial shortfalls in seat capacity in minority neighborhoods (for example, a deficit of 2,500 seats in Roxbury). In 1999, the School Committee began construction of three new schools: Orchard Gardens Elementary School and Boston Middle School in Roxbury, and the Mildred Avenue Middle School in Mattapan. Orchard Gardens will open in the fall of 2003 with 780 new seats. As yet, however, new school construction has had little impact on the disparity between the supply and demand for seats.

the number of seats allocated by walk zone preference to 50 percent, while opening the remaining seats to Zone-wide competition.[12]

To this point, the Superintendent and the School Committee had navigated a constitutionally sound course. They now, however, found themselves caught between the Scylla of a federal court hostile to racial quotas, and the Charybdis of a state law which mandated the very practices they had sought to rescind. Some explanation is in order. In 1965, inspired by Title VI of the 1964 federal Civil Rights Act, 42 U.S.C. § 2000c, Massachusetts adopted the Racial Imbalance Law (RIL), M.G.L. c. 71, § 37C *et seq. See also* M.G.L. c. 15, § 11 ("Duties and Authority of Board of Education to Eliminate Racial Imbalance in Schools"). The RIL declared a state policy of promoting racial balance and eliminating racial isolation in the state's public schools. The RIL defined a racially imbalanced school as one in which more than 50 percent of the students were nonwhite, while racial isolation was deemed to exist when fewer than 30 percent of students in a school were nonwhite. M.G.L. c. 71, § 37D. (As Superintendent Payzant testified, these definitions have little application to the Boston public school system, given its depleted population of enrolled white students). Local and regional school committees are required to furnish the State Board of Education with statistics demonstrating their compliance with the RIL. *Id.* As an incentive, improvement funds, largely in the form of construction grants, were provided to school systems based on the number of "desegregative transfers" within the system, that is, the number of students who,

in effect, were transferred from one school to another as part of the implementation of a desegregation plan approved by the Board of Education. *Id.* (In Boston's case, desegregative transfers were counted by the number of pupils attending schools outside their walk zone).[13]

On February 2, 2000, the State Department of Education, through Commissioner David Driscoll, notified the School Committee that the New Choice Plan required the approval of the Board of Education to qualify for grants under the RIL. In defending the New Choice Plan before the Board on February 23, 2000, Superintendent Payzant explained that despite the innovations, the essential elements of the Old Choice Plan remained undisturbed. "[I]n other words, [we are] keeping the assignment zones, keeping choice as a major option for parents, having some city-wide schools, giving preference to bilingual and special education programs placement in schools. All of the elements of the controlled choice plan remained in place." Ex. 7, Board of Education Minutes. The Superintendent assured the Board that his office would continue to monitor the data to ensure an "ongoing commitment to access and equity." He explained that concerns about racial isolation had motivated the School Committee's adoption of the reduction in the walk zone preference.

> There was a concern that if, with the removal of the racial guidelines, we maintain the 100 percent walk zone preference, that could be problematic, ... [It] is significant in terms of our commitment to continue to make sure that there is an effort to maintain and improve quality, to make sure that access is there to opportunity, to make sure

---

**12.** Students who did not have a school within their walk zone were given first priority in the competition for the open seats.

**13.** The Boston public schools received RIL funds until fiscal year 2002 (November of 2001) when the Legislature cut off funding for the RIL.

that racial isolation doesn't increase and that racial imbalance improves....

The Department of Implementation, which is a unit within the School Department that has full responsibility and is accountable for monitoring and managing the implementation of the student assignment process ...[will] do checkpoints at various times through the year and give me data. For example, we look at what schools are over and under chosen. We look at what's happening with new students that are coming to Boston from the outside. We look at all of the racial data, achievement data and the like.... If we saw some slippage, for example, in certain schools, we could say, "Well, we are not going to have a 50 percent walk zone preference in those schools." We could reduce it to 30 or 25 or 20, to offset any adverse impact that might appear.

Ex. 7, at 33–34. (This last remark, which implied that the school system was willing to selectively push white students out of their neighborhood schools to maintain an "ideal" racial balance, is for plaintiffs the smoking gun).

Superintendent Payzant echoed the same themes in an appearance before the Racial Imbalance Advisory Council on March 10, 2000. The Superintendent defended the elimination of race from student assignments, assuring the Advisory Council that any "slippage" in racial balances could be offset by a further reduction in the walk zone preference. He also predicted, that based on simulations done by his staff, the New Choice Plan would have little impact on Boston's compliance with the RIL.[14] On March 22, 2000, the Advisory Council wrote to Commissioner Driscoll objecting to the modification of

the Old Choice Plan on grounds that "it fails to demonstrate any likelihood that racial imbalance or isolation in the district as a whole will be reduced as a result of this amended plan—a plan that explicitly omits any narrowly tailored strategies designed to ensure compliance with a race conscious state law." Ex. 41. More particularly, the Advisory Council objected to the fact that the New Choice Plan did not incorporate racial enrollment targets or racial guidelines. Notwithstanding, on March 28, 2000, the Board of Education approved the New Choice Plan.

At trial, the defendants, through Superintendent Payzant, testified that the reduction in the walk zone preference was intended to promote parental choice, school excellence, and "diversity." The significant excerpts from the Superintendent's testimony are set out below.

There are really two things that we can't control. One is the neighborhood patterns with respect to who lives in them and what their race or ethnicity is. That's not something the School Department can control. And, secondly, we can offer choice, but when you offer it, you have to go with what parents choose, and so you don't know what they will do. And I was concerned that if we had [a] 100 percent walk zone preference, that we could backslide with respect to racial isolation and racial imbalance just by doing that one thing alone; but, more importantly, it also would be unfair to those neighborhoods that didn't have a sufficient number of schools to serve the children in the walk zone, and it would be unfair to those students who were in geocodes that had a limited number of schools to choose from or no school at all. And then we would be

---

**14.** The Superintendent's prediction was based on the impact he felt that the opening of the three new schools in under-served sections of

Roxbury, Dorchester, and Mattapan, would have on parental choice. *See* Ex. 8, March 13, 2000 letter to the Advisory Council.

engaged in some real issues of equity. And I heard very clearly from parents, [d]on't limit choice until you have sufficient schools in all areas of the city to give the people who want the option of getting one close to home the active choice of getting a school close to home.

Tr. II: 40.

Choice is something that gives parents more options and more opportunity to consider what they believe will be the best fit for their child in a particular school. It creates some competition, which I think, as long as there is a level playing field with respect to the allocation of resources—and that's another thing that I've tried to do in [the] Boston Public Schools—that it makes everybody try a little harder because you've got to compete for students who might otherwise go elsewhere.

Tr. II: 24.[15]

The consensus was that the number one concern of most parents is the quality of the education that their children will receive, and that most parents were interested in diversity. They didn't want to have a school system where everybody was segmented, and in little enclaves where their kids would not be having the opportunity to experience a cross-section of the city. A third—there was clearly a very strong view that while in the minds of parents the quality across all of the schools is still uneven, that they wanted to retain as a significant part of the plan their opportunity to choose schools where they thought there would be a good fit between what they wanted for their students and what their

children would receive. And that until there were more schools built in areas that didn't have a sufficient number of schools, they were worried about some neighborhoods being inequitably treated because they wouldn't have access to choice from certain areas if there is a very narrow approach as to how the choice system worked.

Tr. II: 37–38.

Plaintiffs sought to show that the reduction in the walk zone preference had a discriminatory impact on white students through the trial testimony of Ann Walsh, the president of Boston's Children First.[16] Walsh analyzed the impact of the policy change on kindergarten enrollment at the Murphy, Mozart and Lyons Schools during the 2002–2003 school year. *See* Exs. 34, 35, and 36. While Walsh "has never worked as a statistician," she is currently a law student, has a master's degree in pure mathematics, and "is a couple of courses short of a Master's Degree in computer science." Tr. 1:129. Walsh did not analyze the impact on the remaining 82 elementary schools in the Boston public school system. She was thus unable to quantify the "net [citywide] loss of white students" owing to the reduction in the walk zone preference. Tr. 1:123—124. Walsh testified that "what [she] focused on was schools that had white walkers who would be affected by the 50 percent set-aside." Tr. 1:68.

I chose these schools because what I looked at is schools that had walking white children, white children that had a walk preference, which indicated that

---

15. The school system publishes every January a "report card" on each of its schools, detailing the programs offered by the school, student performance on the Massachusetts Comprehensive Assessment System, promotion rates, attendance and the number of disciplinary suspensions.

16. Boston's Children First is an advocacy group founded by Walsh in 1997 "with the goal of improving the quality of the [Boston public] schools." Tr. 1:42.

the neighborhood around that school had white children who were trying to get into that school who obviously lived near that school, or they couldn't have had the walk preference, which is the way in which I described the neighborhood as having a particular number of white students.... I chose them because you can see the impact of the policy by looking at them.

Tr. 1:52.

In explaining her methodology, Walsh stated that she excluded children with sibling preferences, "because they are exempt from the 50 percent walk reduction," but that she gave a theoretical assignment to "100 percent of the children with a walk preference ... before children without a walk preference." Tr. 1:74; Tr.1:79. Walsh "sorted" the children by pass number and random number. "The [random] number 9 means that the child is not a sibling, has chosen this school as [his or her] first choice and has a walk preference, as opposed to those children who have the number 12 beside them, which means that they have chosen this school as their first choice, are not siblings, and do not have a walk preference. So then within those, it's simply sorted by random number." Tr. 1:48—49. On each of her charts, Walsh indicated the child's race, his or her random number, and two asterisks if the stu-

dent was admitted because of the 50 percent reduction in the walk zone preference.

With regard to the Murphy School (which is located in the East Zone), Walsh testified that of 39 open seats in the K–2 program (28 of the 66 available seats were filled by siblings), 14 were filled by white and 25 by nonwhite children. With a walk zone preference of 100 percent, Walsh concluded that 25 white students, 13 nonwhite walk zone students, and one white nonwalk zone student would have been admitted.[17] While Walsh deemed the Murphy School to be located in a predominately white neighborhood, she conceded that the Murphy is not "necessarily in a neighborhood where the geocodes represent the number of white people who live in the neighborhood." Tr. 1:105. Walsh nonetheless believes that "the 50 percent set-aside has an impact on the number of white students who have access to the Murphy." Tr. 1:103.[18]

With respect to the Lyons School (which is located in the North Zone), Walsh determined that five white and one nonwhite walk zone K–2 program students would have been admitted under a 100 percent walk preference, while two white and four nonwhite students (one living within the walk zone) were admitted under the 50 percent ceiling.[19] Walsh's third example was the Mozart School (which is located in the West Zone).[20] Walsh concluded that

---

**17.** HagopYessayan, the school system's Director of Records Management, testified that according to his calculations, the net loss of white students at the Murphy School was eight rather than eleven students. Tr. 3:30—31.

**18.** According to Yessayan, of the school-age children in the Murphy walk zone, 41 percent are black, 26 percent white, 19 percent Asian and 11 percent Hispanic. Ex. 59; Tr. 3:32. Of the 3,966 enrolled public school students, 45 percent are black, 17 percent white, 23 percent Asian and 14 percent Hispanic. Seventy-two percent of the white parents in the

Murphy walk zone who enrolled their children in the public schools named the Murphy as their first choice. Tr. 3:16.

**19.** Yessayan testified that for the 2002–2003 school year, 65 percent of white parents within the Lyons walk zone selected the Lyons as their first choice school, compared to 0 percent of the parents who were black. Tr. 3:17. Within the walk zone, 82 percent of the Lyons' applicants were white. Tr. 3:39.

**20.** The K–1 program is limited and serves mostly four-year old students. As the school system is legally obligated to educate students

four additional white children would have been admitted to the Mozart K–1 program had the 100 percent walk preference been retained.

While there are weaknesses in Walsh's statistical analysis, particularly with respect to her assumptions about neighborhood demographics, which are based more on anecdotal evidence than on census data, Walsh's conclusion that at least some white students were not admitted to their first choice school because of the reduction in the number of seats allocated to students with a walk zone preference is not open to dispute, as Hagop Yessayan, the School Committee's statistician, readily admitted.[21]

### RULINGS OF LAW AND ULTIMATE FINDINGS

■■■ The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." A law or governmental policy based on preferential racial distinctions of any sort falls squarely within the Fourteenth Amendment and is subject to "the most exacting judicial examination." *Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 273, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion). Under a strict scrutiny analysis, the government "has a burden of production to justify a racial preference." *Cotter v. The City of Boston*,

323 F.3d 160, 168 (1st Cir.2003). Not all race-related government action denotes a racially discriminatory purpose. *Crawford v. Board of Education*, 458 U.S. 527, 538, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982) ("[T]he Court has recognized that a distinction may exist between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters."). It is not impermissible, for example, for government to use race-neutral means to expand opportunities for minorities to participate in government sponsored programs. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). What is forbidden is the use of racial classifications as a talisman for the awarding or withholding of government benefits. *Wessmann*, 160 F.3d at 799. Motive, in other words, is not always suspect. Means, however, may be. When government resorts to racial classifications to regulate participation in a government program, it must show that such classifications "are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).[22]

■■■ Plaintiffs have the initial burden of showing that their right to equal protection was violated by an intentionally discriminatory School Committee policy. *Cotter*, 323 F.3d at 168; *Hayden v. County*

---

only when they turn six, "there are hundreds, if not thousands, of applicants for K–1 who are not assigned to K–1 programs." Tr. 1:117–118.

**21.** While Yessayan conceded that white students lost seats at the Murphy, Lyons and Mozart Schools after the change in the walk zone policy, he attributed the loss to the pattern of parental choice. Tr. 3:23. "[Y]ou're only changing one population with another." *Id.*

**22.** As Judge Selya pointed out in *Wessmann*, 160 F.3d at 795, there is a settled consensus that race-based state action "is acceptable upon a showing, *inter alia*, that it is needed to undo the continuing legacy of an institution's past discrimination." Whether it is acceptable in other settings is a matter of intense debate among the circuit courts.

*of Nassau,* 180 F.3d 42, 48 (2d Cir.1999). This they may do in one of three ways. First, plaintiffs may show that the policy is discriminatory on its face because of its unvarnished use of racial classifications. *Raso v. Lago,* 135 F.3d 11, 16 (1st Cir. 1998). A second alternative is to show that a facially neutral policy is nonetheless applied by government actors in a discriminatory manner. *Id.* at 17. And finally, a facially neutral policy may be shown to have been motivated by a discriminatory animus and, as applied, has a discriminatory effect. *Soto v. Flores,* 103 F.3d 1056, 1067 (1st Cir.1997). What each of these showings has in common is the element of intentional discriminatory conduct on the part of government actors.

█ That the first alternative does not apply in this case is apparent. As drawn, the walk zone policy is racially neutral on its face. It does not divide students by racial categories, nor does it specify different treatment for different students because of their race or ethnicity. It impacts all students equally.[23] A minority student's choice is governed by the same rules as is the choice of a white student (although the minority student for historical reasons may have fewer neighborhood schools from which to choose). Nor with respect to the second alternative is there evidence (with one possible exception) that school officials have applied the walk zone policy in a discriminatory manner, for ex-

ample, by enforcing it only in neighborhoods with larger concentrations of white children, or by allocating fewer walk zone seats in neighborhoods with higher white enrollments. The one possible exception is the new K–8 Orchard Gardens School, scheduled to open in the fall of 2003 in Roxbury Crossing, a predominately minority neighborhood. Orchard Gardens is unique in that its walk zone preference will, under current School Committee policy, be increased to 75 percent. In justifying the increase, Superintendent Payzant testified that the School Committee had responded to an "outpouring of sentiment" from the community. "That was one factor, and it was done because of the density of the population in the Orchard Gardens area and the fact that even if each of the 780 seats were opened to students in the immediate area, that this would not come close to serving all of the children who reside there." Tr. II: 88.[24]

The more difficult issue is posed by the third alternative, whether the defendants have adopted a policy, which while facially neutral, was motivated by a discriminatory animus and the expectation that it would have a discriminatory effect on white students. Stated another way, it was open to plaintiffs to show that the reduction in the walk zone preference has had a disproportionate impact on white children, that is, that a greater percentage of white students have found themselves shut out of their neighborhood schools. This plaintiffs

---

**23.** Plaintiffs, quoting *Wessmann,* 160 F.3d at 795 n. 1, make the point "that burdening different groups equally [does not make] classifications based on race constitutionally acceptable." Plaintiffs' Proposed Finding 9. As true as this is, the School Committee's walk zone policy classifies students not on the basis of their race but rather according to the geocode in which they reside.

**24.** While there is no evidence that the increase in the walk zone preference for Orchard Gardens was undertaken for racially

motivated reasons, the Orchard Gardens exception is troubling, particularly given statements that the Superintendent has made in the past suggesting that walk zone preferences might be adjusted for individual schools as a means of achieving racial balance. *See Boston's Children First,* 183 F.Supp.2d at 400. The preferential treatment given to this school when schools in other neighborhoods have been denied the same benefit, invites the very suspicions that have fueled this lawsuit.

have not done. Instead, they have concentrated on the defendants' mantra of "diversity," which they allege is a barely concealed admission of an official policy of discrimination against white students. The word diversity excites a frisson because of its prevalent use as a code word for racial balancing. In *Wessmann*, for example, the Court of Appeals acknowledged the proposition that diversity, at least as it was defined by Justice Powell in *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.), might in appropriate circumstances constitute a compelling governmental interest justifying considerations of race. "Encounters between students of varied backgrounds facilitate a vigorous exchange of ideas that not only nourishes the intellect, but also furthers mutual understanding and respect, thereby eroding prejudice and acting as a catalyst for social harmony." *Wessmann*, 160 F.3d at 797. The Court nevertheless faulted the School Committee defendants for failing to give any constitutionally acceptable content to the word. As the Court of Appeals found, the School Committee's exaltation of diversity reduced itself to the circular argument "that unless race and ethnicity were explicitly factored into the admissions calculus, attainment of racial and ethnic diversity might be jeopardized. This attempted confirmation does not pass constitutional muster." *Id.* at 798.

Having learned the lessons of *Wessmann*, the diversity argument offered by Superintendent Payzant at trial, while alluding to the desirability of geographic integration, simply restated his more convincing point that the revised assignment plan is intended to address issues of equity by giving parents in under-served neighborhoods fairer access to the school system's resources.[25] Shorn of its service as a vehicle for group preferences, the Superintendent's specification of diversity as a goal of the New Choice Plan, to the extent that it has any content at all, does not raise the constitutional concerns that it did in *Wessmann*.

Plaintiffs have shown that in three selected schools some white children were denied seats that they would have been assigned under a 100 percent walk zone preference. What they have not been able to show is that the loss was due to discrimination, and that minority students received preferential treatment at the white students' expense. Rather, as defendants point out, white students have been denied admission to certain schools, not because they were forced to compete on a non-level playing field, but because their parents have tended to over-choose these same schools. *See* nn. 18, 19, *supra.* Even so, in the 2002–2003 school year, 80 percent of white applicants received their first choice of schools, as compared to 77 percent of black applicants.

"Only if the law imposes unequally on a protected class or burdens a fundamental right, will it be subjected to more searching scrutiny." *Opinion of the Justices*, 423 Mass. 1201, 1232, 668 N.E.2d 738 (1996).

**25.** One can contrast the testimony given by Superintendent Payzant in *Wessmann,* which was summarized by the First Circuit as follows. "Superintendent Payzant testified that a 'fair representation of a cross-section of students' of the Boston public schools would constitute a proper 'reference point' for defining a 'diverse mix' of students. The 'cross-section' to which he referred is comprised of the proportions of seventh- and ninth-grade black, Hispanic, white, and Asian students enrolled in Boston's public high schools. Another 'reference point' mentioned by Payzant was the 'proportional representation' embodied by the Policy, which, given his other testimony, is ultimately designed to move in the direction of the same racial/ethnic distribution." *Id.*

In the absence of a discriminatory purpose or effect, "a classification will withstand a constitutional challenge as long as it is rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational." *LCM Enterprises, Inc. v. Town of Dartmouth,* 14 F.3d 675, 679 (1st Cir.1994). While the classification at issue here divides those who receive a guaranteed placement in a neighborhood school from those who must compete for seats in the same school in a race-blind lottery, the Constitution does not require that a government policy be based on mathematical nicety or perfect equality—it requires only that it be supported by some rational basis.[26] *Bowen v. Gilliard,* 483 U.S. 587, 600–601, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987). Because the School Committee has rescinded the use of any form of racial classification, direct or indirect, in the New Choice Plan, its stated objectives of preserving parental choice and opportunity, particularly for parents who would otherwise be restricted in their choice of schools, and of fostering school excellence by permitting parents to vote with their feet, satisfy the reasonableness test.

Plaintiffs ultimately do not dispute the fact that the School Committee has eliminated race in the implementation of the new school assignment policy. Rather, plaintiffs question the defendants' sincerity in doing so. As the plaintiffs succinctly put it, despite the School Committee's change in policy, "[t]he defendants cannot be trusted to not return to the use of race in the future." Plaintiffs' Proposed Finding 75. For that reason, plaintiffs urge the court to retain jurisdiction to "discourage the defendants from the further illegal use of race in their next student assignment policy and avoid the risk of another 3½ years of litigation should the Defendants choose to adopt another non-remedial racial balancing policy to replace the current one." Plaintiffs' Proposed Finding 76. Plaintiffs' scepticism with regard to the defendants' motives is perhaps understandable, given the mix of good intentions and, at times, poor policy choices, that have informed many of the School Committee's efforts to rectify an inherited legacy of discrimination.[27] Mere scepticism, however, about the defendants' future intentions, cannot justify the type of judicial intervention that plaintiffs seek. As the court has previously observed:

> [a]s a rule, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). The rule, however, is applied more flexibly to governmental authorities who are expected to be scrupulous in their regard for constitutional obligations. "Courts are more apt to trust public officials than private defendants to desist from future violations." [13A] Wright, Miller & Cooper, *Federal Practice and Procedure: Juris-*

---

**26.** While the rational basis test is most often applied to the analysis of the permissible limits of state regulation of commerce and industry, it is equally applicable in cases involving the impact of state policies on fundamental rights. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Moreover, apart from any potential for invidious discrimination, it is not clear that a fundamental right is in play in this case. While there is unarguably a fundamental right to a free public education, there is no equivalent right to receive that education in a neighborhood school.

**27.** I do not mean this to be taken as a criticism of the present school administration. The guidance provided by the federal courts to the defendants over the years has not always been a model of clarity.

*diction 2d* § 3533.7 (2d ed. 1984 & Supp. 2001). *See D.H.L. Associates, Inc. v. O'Gorman,* 199 F.3d 50, 55 (1st Cir.1999) (where Town changed an unconstitutional zoning ordinance in response to litigation, it was unreasonable to conclude, without any evidence to the contrary, that the Town would reinstate the offending ordinance once the litigation was concluded). *See also McClendon v. City of Albuquerque,* 100 F.3d 863, 867–868 (10th Cir.1996) ("In order to find a live controversy we would have to assume that defendants will again close their eyes to the anticipated number of jail residents, fail to plan in advance for them, and violate the settlement agreement. We decline to so speculate."); *Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir.1991) (courts place great confidence in genuine acts of official self-correction); *Kiedos v. Apfel,* 45 F.Supp.2d 80, 88 (D.Mass.1999) (same).

*Boston's Children First,* 183 F.Supp.2d at 395. *See also Cotter,* 323 F.3d at 173–174 (finding error where the district court retained jurisdiction over future police promotions under a consent decree when, despite a history of past discrimination, the City had done nothing to violate the appellants' constitutional rights nor anything to suggest an unwillingness to comply with constitutional norms in future decision-making).

Nonetheless, plaintiffs should not underestimate what they have accomplished. By bringing this lawsuit, they have persuaded the School Committee to abandon a constitutionally dubious school admissions policy. Plaintiffs have not obtained all of the relief they sought, principally because the court believes that their ultimate goal, mandatory neighborhood school assign-

ments, however meritorious as a matter of public policy, is not constitutionally compelled.

### ORDER

For the foregoing reasons, judgment shall enter for the defendants. Plaintiffs' motion for a declaratory judgment invalidating the School Committee's current walk zone preference policy is *DENIED.* Plaintiffs' motion for an order enjoining future constitutional violations by defendants is *DENIED.* Plaintiffs' request that the court retain jurisdiction is *DENIED* in the absence of any continuing case or controversy.[28]

SO ORDERED.

---

**28.** The court had previously bifurcated the claims of certain of the individual plaintiffs for an award of nominal damages, and will address that matter separately.